# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *A white, 2019 model year Jeep Wrangler Rubicon, bearing California license plate number 8JBT331 and Vehicle Identification Number ("VIN") 1C4HJXCN3KW502324 as described in Attachment A-1* | ) ) ) ) ) ) |

Case No. **2:24-mj-03588-DUTY**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):* See Attachment A-1
located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):* *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |
| 18 U.S.C. § 924(c) | Carrying Firearms During and In Relation To, and Possession of Firearms in Furtherance of, Drug Trafficking Crimes |

The application is based on these facts: *See attached Affidavit*
☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____*)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Jacob Johanson*
_____
*Applicant's signature*

Jacob Johanson, DEA
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___June 14, 2024___

*Patricia Donahue*
_____
*Judge's signature*

City and state: Los Angeles, CA _____

Hon. Patricia Donahue, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Kenneth R. Carbajal (x3172)

**<u>ATTACHMENT A-1</u>**

<u>VEHICLE TO BE SEARCHED</u>

White 2019 model year Jeep Wrangler Rubicon, bearing California license plate number 8JBT331 and Vehicle Identification Number ("VIN") 1C4HJXCN3KW502324, which is registered to "Garcia Angelina, or Vargas Daisy", registered address of 8547 Imperial Hwy Apt 67B, Downey, CA 90242 (the "SUBJECT VEHICLE"), currently in the custody of the Hawthorne Police Department pictured below:



**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C § 841(a)(1) (Possession with Intent to Distribute and Distribution of a Controlled Substance), 21 U.S.C. § 846 (Conspiracy to Distribute or Manufacture a Controlled Substance), 18 U.S.C. § 922(o) (Possession of a Machinegun), 18 U.S.C § 924(c) (Carrying a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, a Drug Trafficking Crime), 18 U.S.C. § 933 (Trafficking in Firearms), and 18 U.S.C. § 5861(d) (Possession of Unregistered Firearms) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms and ammunition;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks,

traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

   f. Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   g. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

   h. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      i.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      j.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

      k.    Contents of any calendar or date book;

      l.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      m.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

      n.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries,

configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.  evidence of the times the device was used;

      vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

      vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.    records of or information about Internet Protocol addresses used by the device;

      ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

iv

2.    Illegal or unregistered handguns, shotguns, firearms, ammunition, high capacity magazines and weapons.

3.    As used herein, the terms "records", "documents", "programs", "applications" and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICES

5.    In searching the SUBJECT DEVICE or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   j. After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  6. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

  7. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Jacob Johanson, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Brian LOPEZ ("LOPEZ") for violations of 21 U.S.C § 841(a)(1) (Possession with Intent to Distribute and Distribution of a Controlled Substance) and 18 U.S.C § 924(c) (Carrying a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, a Drug Trafficking Crime).

2.    This affidavit is also made in support of an application for a warrant to search a white, 2019 model year Jeep Wrangler Rubicon, bearing California license plate number 8JBT331 and Vehicle Identification Number ("VIN") 1C4HJXCN3KW502324, which is registered to "Garcia Angelina, or Vargas Daisy", registered address of 8547 Imperial Hwy Apt 67B, Downey, CA 90242 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-1, and a iPhone with a green case with a sticker on the case (the "SUBJECT PHONE"), as described more fully in Attachment A-2.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C § 841(a)(1) (Possession with Intent to Distribute and Distribution of a Controlled Substance), 21 U.S.C. § 846 (Conspiracy to Distribute or Manufacture a Controlled Substance), 18 U.S.C. § 922(o) (Possession of a Machinegun), 18

U.S.C § 924(c) (Carrying a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, a Drug Trafficking Crime), 18 U.S.C. § 933 (Trafficking in Firearms), and 18 U.S.C. § 5861(d) (Possession of Unregistered Firearms) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  All dates and times are approximate.

## II.  <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since September 2023. I am currently assigned to the Southern California Drug Task Force, High Intensity Drug Trafficking Area Group 48 ("HIDTA 48"), which investigates large-scale drug trafficking organizations operating in Southern California and elsewhere.

6.    Before becoming a DEA Special Agent, from August 2018 to November 2021, I was a Police Officer with the Fairfax County Police Department. I then worked as a Special Agent with the

Naval Criminal Investigative Service ("NCIS") from May 2022 to
May 2023. I was hired by the DEA in May 2023 and completed the
Basic Agent Training Academy in September 2023.

7.    I have received training on investigating violations
of federal drug and money laundering laws, including but not
limited to, 21 U.S.C. §§ 841, 846, 952, 959, and 963, and 18
U.S.C. § 1956(a). I have been trained in various electronic
surveillance methods, and in the debriefing of defendants,
informants, and witnesses, as well as others who have knowledge
of the manufacturing, distribution, transportation, storage, and
importation of controlled substances and the laundering of drug
proceeds. I have been trained in using a variety of
investigative techniques and resources, which include physical
surveillance, electronic surveillance, analysis of telephone
records, and the use of informants and cooperating sources. I
have been trained in undercover operations and in planning and
executing arrest and search warrants. Based on my experience as
a Police Officer and Special Agent, I have become familiar with
interviewing and interrogation techniques.

8.    Through my formal training and experience
investigating narcotics cases, I have become familiar with the
methods drug traffickers use to manufacture, store, transport,
and distribute narcotics, and how they collect and launder
proceeds from their illegal activity.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.    On February 28, 2024, in Norwalk, CA, an individual
DEA has identified as a drug and weapons trafficker ("Co-

Conspirator 1") sold 5,000 fentanyl pills to a DEA confidential source ("CS-1") for $4,500.

10.  On February 29, 2024, in South Gate, CA, Co-Conspirator 1 sold three AR-style firearms, one lever action rifle, one AR-style lower receiver, three AR rifle magazines, and assorted ammunition to a Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Undercover Agent (the "UC")[1] for $4,500.

11.  On March 13, 2024, in South Pasadena, CA, Co-Conspirator 1 sold one AR-style rifle, four handguns, an assortment of ammunition, and an assortment of magazines to the ATF UC for $6,700.

12.  On March 19, 2024, in Montebello, CA, Co-Conspirator 1 sold 5,000 fentanyl pills to CS-1 for $3,500.

13.  On March 27, 2024, in Lynwood, CA, Co-Conspirator 1 sold three rifles, two pistols, an assortment of ammunition, an assortment of magazines, and a suspected "Glock Switch" machinegun conversion device for $8,250 to the ATF UC.

14.  On April 16, 2024, in Lynwood, CA, Co-Conspirator 1 sold two AR-style rifles, five pistols, an assortment of ammunition, a pistol lock box, and pistol cases to the ATF UC for $9,700.

15.  On May 7, 2024, in Pasadena, CA, Co-Conspirator 1 met with CS-1 and was introduced to a second DEA confidential source ("CS-2").

---

[1] The ATF utilized the same UC for all of their deals with Co-Conspirator 1.

16.  On June 13, 2024, Co-Conspirator 1 and CS-1 communicated via WhatsApp regarding a 100,000-pill deal at 2100 N. Long Beach Blvd., Compton, CA 90221. DEA SA Albert Polito observed Co-Conspirator 1 enter into the passenger's seat of the SUBJECT VEHICLE. Shortly after Co-Conspirator 1 entered into the SUBJECT VEHICLE, CS-1 received a WhatsApp facetime call from Co-Conspirator 1. According to CS-1, Co-Conspirator 1 showed CS-1 clear plastic bags containing blue pills.

17.  A California Highway Patrol ("CHP") marked unit later attempted to initiate a traffic stop on the SUBJECT VEHICLE. The SUBJECT VEHICLE accelerated away at a high rate of speed from the CHP marked unit before stopping in front of 4621 Olanda St., Lynwood, CA 90262. LOPEZ exited from the passenger's seat of the SUBJECT VEHICLE holding an object. LOPEZ placed the object into a trash can outside of 4606 Olanda St. and proceeded to walk away from the location. CHP Officers located LOPEZ moments after he discarded the object into the trash can and took LOPEZ into custody. CHP Officer McCarthy recovered a loaded Colt 9MM handgun that had ten live rounds, including one in the chamber, and a loaded Fiel Comp Guardian .25 caliber semi-automatic handgun that contained seven live rounds in the magazine, from LOPEZ. CHP Officer McCarthy and CHP Officer Lopez recovered the SUBJECT PHONE from the ground in close proximity to where LOPEZ was taken into custody.

18.  Hawthorne Police Department Detective Mark Hultgren located two shopping bags, one red and one blue, from inside of the trash can that LOPEZ had discarded the object. The red and

5

blue shopping bags contained blue pills. The pills were small and stamped with "M" on one side and "30" on the reverse side, which is common for counterfeit oxycodone pills containing fentanyl.

### IV.   STATEMENT OF PROBABLE CAUSE

19.    Based on my training and experience, review of law enforcement reports, and conversations with other law enforcement agents, I know the following:

20.    According to CS-1[2], on January 20, 2024, Co-Conspirator 1 and CS-1 discussed buying and selling both fentanyl pills and firearms.

21.    On February 23, 2024, CS-1 met with Co-Conspirator 1 in Downey, CA. The meeting was audio and video recorded, and investigators listened in real-time. During the meeting, Co-Conspirator 1 informed CS-1 that he would sell 10,000 for $7,000. Co-Conspirator 1 never described the "10,000" as fentanyl. Throughout their meetings and conversations Co-Conspirator 1 has used coded language, such as "dulces." According to a Spanish-speaking Task Force Officer ("TFO"), "dulces" translates to "candies," which I know, based on my

---

[2] CS-1 began working with the DEA in November 2021 after pleading guilty to possession with intent to distribute methamphetamine. CS-1 is working with the DEA in exchange for a potential sentence reduction in that case as well as deferred action on the CS-1's immigration status. CS-1's criminal history includes convictions for possession of burglary tools, burglary, driving without a license, and providing false identification to a police officer. CS-1's criminal history also includes arrests for vehicle theft, grand theft, burglary, use of another person's identification, conspiracy to commit a crime, and forgery.

training and experience, to be slang for fentanyl pills. Co-Conspirator 1 made a phone call during the meeting and confirmed with an unknown individual on the phone that 10,000 would be ready for CS-1 to purchase. Co-Conspirator 1 also discussed selling rifles.

22.  After this meeting, California Army National Guard Counterdrug Task Force Sgt. Taylor Ige observed Co-Conspirator 1 get into the driver's seat of a 2019 black Toyota C-HR.

23.  On February 27, 2024, according to CS-1, Co-Conspirator 1 contacted CS-1 via WhatsApp[3] and confirmed he was ready to go forward with the transaction on February 28, 2024. Co-Conspirator 1 also said he was already in possession of CS-1's order.

**A. PURCHASE OF FENTANYL PILLS ON FEBRUARY 28, 2024**

24.  On February 28, 2024, Co-Conspirator 1 and CS-1 agreed to meet between 10:00 a.m. and 11:00 a.m., at a Costco in Norwalk, CA. Later that day, DEA TFO Alberto Alvarado and I searched CS-1 and his car for contraband, and gave CS-1 $4,500 for the controlled buy. We did not locate any contraband. TFO Alvarado and I watched CS-1 travel to the Costco parking lot. DEA SA Alex Wendel observed Co-Conspirator 1 get into the passenger's side of CS-1's vehicle. According to CS-1, and corroborated by investigators who listened to a recording and observed a video recording that captured part of the meeting in real-time, Co-Conspirator 1 sat in the passenger's seat of

---

[3] Investigators reviewed the WhatsApp messages referenced throughout this affidavit between Co-Conspirator 1 and CS-1, which corroborated CS-1's statements.

his/her car. According to CS-1, Co-Conspirator 1 had a backpack with him, which he opened and removed a green plastic bag. Co-Conspirator 1 stated they were good quality, and the product would be the same product that CS-1 would buy in the future. Co-Conspirator 1 gave CS-1 the green bag, and CS-1 opened it and saw two clear plastic bags containing blue pills. CS-1 then gave Co-Conspirator 1 $4,500 in cash. Co-Conspirator 1 counted the money. CS-1 confirmed that the price for the next 5,000 would be $3,500, and Co-Conspirator 1 agreed. The two then agreed to another deal to take place the following week.

25.  On February 28, 2024, I took the two clear plastic bags containing pills from CS-1. Based on my training, experience, and knowledge of this investigation, I believe that the pills were fentanyl pills. They were small, blue, and stamped with "M" on one side and "30" on the reverse side, which is common for counterfeit oxycodone pills containing fentanyl. The pills were not field tested; but they were submitted for lab testing, and tested positive for fentanyl.

**B. PURCHASE OF FIREARMS ON FEBRUARY 29, 2024**

26.  On February 29, 2024, Co-Conspirator 1 agreed to meet with an ATF SA acting in an undercover capacity (the "UC") in South Gate, CA. Upon the arrival of the UC to the meet location, the UC observed Co-Conspirator 1 standing near the trunk of the Toyota C-HR. The UC observed bulky items in the trunk of the Toyota C-HR. Co-Conspirator 1 informed the UC the firearms were wrapped inside each bulky item. The UC transferred the items from the Toyota C-HR to the UC vehicle. In total, Co-Conspirator

1 sold one Anderson Manufacturing, model AM-15, multi-caliber AR style lower receiver bearing serial number 15054516; one AR style upper receiver; one Anderson Manufacturing, model AM-15, 5.56 caliber, AR style rifle bearing serial number 15054518; one Anderson Manufacturing, model AM-15, 5.56 caliber, AR style rifle bearing serial number 15054519; and one Savage, model 1899, 30-30 caliber lever action rifle, bearing serial number 105556; to the UC for $4,500. After the deal, Co-Conspirator 1 returned to the Toyota C-HR.

### C. PURCHASE OF FIREARMS ON MARCH 13, 2024

27.   On March 13, 2024, Co-Conspirator 1 agreed to meet with the ATF UC in South Pasadena, CA. Co-Conspirator 1 arrived at the meet location and parked the Toyota C-HR next to the UC's vehicle, got out of the Toyota C-HR, removed a large blue bag from the trunk of the Toyota C-HR, and placed it in the back seat of the UC vehicle. Co-Conspirator 1 and the UC discussed firearms sales and Co-Conspirator 1 told the UC that the firearms would be coming from out of the state without any California restrictions. In total, Co-Conspirator 1 sold one privately manufactured rifle, unknown make, model or serial number, caliber: 5.56 NATO, with two magazines; one pistol, make: Diamondback Arms Inc., model: DB380, caliber: .380 AUTO, with an obliterated serial number and one magazine; approximately 36 rounds of .380 AUTO ammunition; approximately 15 rounds of 9mm ammunition; approximately seven rounds of .45 ACP ammunition; assorted bags and packaging; one pistol, make: Taurus, model: PT 809, caliber: 9mm, S/N: TJS28838, with two

2588-DUTY    Document 1    Filed 06/14/24    Page 20 of 34    Page ID #:20

magazines; one pistol, make: Israel Weapon Industries, model:
MASADA, caliber: 9mm, S/N: M1023416, with two magazines; and one
pistol, make: HS Product, model: XD45, caliber: .45 ACP, S/N:
XD750992, with one magazine; for a total of $6,700. After the
deal, an ATF surveillance unit observed Co-Conspirator 1 depart
from the location in the Toyota C-HR.

**D. PURCHASE OF FENTANYL PILLS ON MARCH 19, 2024**

28.  On March 19, 2024, TFO Alvarado and I searched CS-1
and his car for contraband and found none. I then gave CS-1
$3,500 for the controlled buy. TFO Alvarado and I watched CS-1
travel to the parking lot of 2559 Via Campo, Montebello, CA
90640. I saw Co-Conspirator 1 exit the driver's seat of the
Toyota C-HR, retrieve an item out of the trunk, and get into the
front passenger's seat of CS-1's vehicle. According to CS-1, and
corroborated by investigators who listened to a recording of the
meeting in real-time, Co-Conspirator 1 sat in the passenger's
seat of his/her car, gave CS-1 the plastic bag and informed CS-1
the pills were separated into five 1,000 count bags. CS-1 opened
the plastic bag and saw five clear plastic bags containing blue
pills. CS-1 then gave Co-Conspirator 1 the $3,500. Co-
Conspirator 1 counted the money. CS-1 told Co-Conspirator 1 to
prepare himself to move forward with a bigger deal. Co-
Conspirator 1 then exited from CS-1's vehicle and left.

29.  On March 19, 2024, I took the two clear plastic bags
containing pills from the CS-1. The pills were small, blue, and
stamped with "M" on one side and "30" on the reverse side, which
is common for counterfeit oxycodone pills containing fentanyl.

10

They were submitted for lab testing and tested positive for
fentanyl.

      **E. PURCHASE OF FIREARMS ON MARCH 27, 2024**

    30.  On March 27, 2024, Co-Conspirator 1 agreed to meet
with the ATF UC in Lynwood, CA. The UC observed Co-Conspirator 1
arrive in the Toyota C-HR, walk to the trunk of the vehicle,
open the trunk, and give a cardboard box to the UC. Co-
Conspirator 1 informed the UC that some of the firearms were
inside of the cardboard box. Co-Conspirator 1 gave the UC two
plastic bags containing pistols and a suspected "Glock Switch."
In total, Co-Conspirator 1 sold one rifle, make: American
Tactical, model: Omni Hybrid, caliber: 5.56 NATO, S/N: NS076188;
one rifle, make: American Tactical, model: Omni Hybrid, caliber:
5.56 NATO, S/N: NS076190; one rifle, make: American Tactical,
model: Omni Hybrid, caliber: 5.56 NATO, S/N: NS076196; one
pistol, make: Freedom Ordnance, model: FX-9, caliber: 9mm, S/N:
048251; approximately nine rounds of .38 Super caliber
ammunition; three 10-round black rifle magazines; one pistol,
make: Rock Island Armory, Model: M1911-A1FS, caliber: .38 Super,
S/N: RIA1323224; and one "Glock switch" suspected machinegun
conversation device; for $8,250. After the deal, an ATF
surveillance unit observed Co-Conspirator 1 depart the location
in the Toyota C-HR.

      **F. PURCHASE OF FIREARMS ON APRIL 16, 2024**

    31.  On April 16, 2024, Co-Conspirator 1 agreed to meet
with the ATF UC in Lynwood, CA. The UC observed Co-Conspirator 1
arrive in the Toyota C-HR and remove a pistol case from the

Toyota C-HR, which contained a pistol. Co-Conspirator 1 gave the case to the UC. Co-Conspirator 1 then removed a pistol safe from the Toyota C-HR, which contained two pistols, and gave it to the UC. Co-Conspirator 1 removed another pistol case, which contained a pistol, from the Toyota C-HR and gave it to the UC. Co-Conspirator 1 removed two rifles and a pistol wrapped in a white sheet from the Toyota C-HR and provided it to the UC. In total, Co-Conspirator 1 sold one pistol, make: Extar LLC, model: EP9, caliber: 9mm, S/N: P14205; one personally manufactured rifle, unknown make, model or S/N. caliber: 5.56 NATO; one personally manufactured rifle, unknown make, model or S/N. caliber: 5.56 NATO; one pistol, make: Smith & Wesson, model: M&P 9 Shield, caliber: 9mm, S/N: IFT2603; one personally manufactured pistol, unknown make, model, caliber and S/N; one pistol, make: Taurus, model: G3, caliber: 9mm, S/N: ABJ946719; one pistol, make: Taurus, model GX4, caliber: 9mm, S/N: 1GC21781; approximately eight rounds of 9mm ammunition; along with one white sheet, one Sig Sauer pistol case, one Taurus pistol case, and one pistol lock box, for $9,700.

32. On May 2, 2024, Co-Conspirator 1 sent CS-1 a picture of what appeared to be fentanyl pills via WhatsApp.

33. On May 7, 2024, CS-1 and CS-2[4] met with Co-Conspirator 1 in Pasadena, CA. The meeting was recorded, and investigators

---

[4] CS-2 began to cooperate with the DEA in 2009. CS-2 has been convicted of multiple charges related to drug trafficking and money laundering. CS-2 most recently pled guilty to conspiracy to distribute cocaine in 2008. Since 2009, CS-2 has assisted in numerous federal investigations. CS-2 is now financially compensated for his/her assistance in investigations.

listened in real-time. During the meet, Co-Conspirator 1 called his cousin in Mexico, who runs the DTO, to allow CS-2 to discuss future narcotic sales.

34.  After the meet, Co-Conspirator 1 contacted CS-1 via WhatsApp and told CS-1 that he could sell 500,000 as long as CS-1 and CS-2 had the cash on hand. Co-Conspirator 1 stated before moving forward, Co-Conspirator 1 wanted CS-1 and CS-2 to purchase 100,000 to build trust between them. Co-Conspirator 1 stated after the 100,000 they would do 500,000 every two weeks. Based on Co-Conspirator 1's prior interactions with CS-1, as discussed above, and the context, I believe Co-Conspirator 1 was discussing the sale of pills containing fentanyl.

35.  On June 4, 2024, Co-Conspirator 1 contacted CS-1 via WhatsApp regarding the future sale. On June 5, 2024, CS-1 responded to Co-Conspirator 1 and stated he/she wanted to purchase 100,000 "botones" on June 13, 2024, and the remaining 400,000 on June 14, 2024. Co-Conspirator 1 agreed and stated the "producto" is there. Co-Conspirator 1 requested the money be separated into $10,000 increments. According to a Spanish-speaking Task Force Officer ("TFO"), "botones" translates to buttons and "producto" translate to product which I know, based on my training and experience, to be slang for fentanyl pills and for drugs, respectively.

**G. Suspected Fentanyl Pill buy bust on June 13, 2024**

36.  On June 13, 2024, Co-Conspirator 1 contacted CS-1 via WhatsApp and told CS-1 that Co-Conspirator 1 would be sending CS-1 directions. Co-Conspirator 1 stated he would be getting

into an individual's vehicle while they count the money. Co-Conspirator 1 stated once the money was counted and verified, the individual would give Co-Conspirator 1 the "botones." Co-Conspirator 1 stated he would then give the "botones" to CS-1.

37. On the same day, Co-Conspirator 1 provided the address of 4360 S Figueroa St, Los Angeles, CA 90037 (the "Figueroa Address"), to CS-1 as the address of the deal location. Surveillance units observed Co-Conspirator 1 enter into the Toyota C-HR and travel in the vicinity of the Figueroa Address. Co-Conspirator 1 and the CS-1 continued to negotiate the terms of the sale throughout the day via WhatsApp messages, phone calls and a video call.

38. Later that day, Co-Conspirator 1 contacted CS-1 via WhatsApp, and informed CS-1 to meet at 2100 N Long Beach Blvd Compton, CA 90221 (the "Long Beach Address"). Co-Conspirator 1 informed CS-1 that Co-Conspirator 1 would meet the courier and would show CS-1 the pills via a video call.

39. Surveillance units saw Co-Conspirator 1 travel to the Long Beach Address. While at the Long Beach Address, surveillance units observed the SUBJECT VEHICLE arrive in the lot followed by a black Audi sedan, California license plate 9GOM427, registered owner of Mesino Eloy Garcia, registered address of 15607 Kervin Ave, Paramount, CA 90725. An additional black Toyota Tacoma, California license plate 47321H2, registered address of 13258 Barlin Ave, Downey, CA 90242, entered into the lot and parked facing the SUBJECT VEHICLE.

40.    DEA SA Albert Polito observed Co-Conspirator 1
approach the SUBJECT VEHICLE and enter into the passenger's seat
of the SUBJECT VEHICLE. Shortly after Co-Conspirator 1 entered
into the SUBJECT VEHICLE, CS-1 received a WhatsApp Facetime call
from Co-Conspirator 1. According to CS-1, Co-Conspirator 1
showed CS-1 clear plastic bags containing blue pills.

41.    SA Polito saw the SUBJECT VEHICLE, the Toyota Tacoma,
and the black Audi exit from the meet location parking lot.

42.    Shortly after the SUBJECT VEHICLE left the parking
lot, a California Highway Patrol ("CHP") marked unit attempted
to initiate a traffic stop on the SUBJECT VEHICLE. The SUBJECT
VEHICLE accelerated away at a high rate of speed from the CHP
marked unit. The SUBJECT VEHICLE drove erratically at a high
rate of speed through residential neighborhoods fleeing from the
CHP vehicle. California Army National Guard Counterdrug Task
Force Sgt. Eric Covarrubias observed an unidentified passenger,
believed to be Co-Conspirator 1, exit from the vehicle at an
unknown location. The SUBJECT VEHICLE continued to try to evade
law enforcement, before parking in front of 4621 Olanda St.,
Lynwood, CA 90262. Sgt. Covarrubias observed the driver of the
SUBJECT VEHICLE exit from the vehicle and walk away from the
SUBJECT VEHICLE. Sgt. Covarrubias observed an individual, later
identified as LOPEZ, exit from the passenger's side of the
SUBJECT VEHICLE holding an object. Sgt. Covarrubias observed
LOPEZ place the object into the trash can outside of 4606 Olanda
St., Lynwood, CA 90262, and proceed to walk away from the
location. CHP Officer McCarthy and CHP Officer Lopez, assisted

by Sgt. Covarrubias, located LOPEZ moments after he discarded
the object into the trash can and took LOPEZ into custody. CHP
Officer McCarthy recovered one loaded Colt 9MM handgun that had
ten live rounds, including one in the chamber and one loaded
Fiel Comp Guardian .25 cal semi-auto handgun, that contained
seven live rounds in the magazine from LOPEZ's person.

43.    CHP Officer McCarthy and CHP Officer Lopez recovered
the SUBJECT PHONE from the ground in close proximity to where
LOPEZ was taken into custody.

44.    Hawthorne Police Department Detective Mark Hultgren
responded to 4606 Olanda St., Lynwood, CA 90262 and located two
shopping bags, one red and one blue, inside of the trash can
that LOPEZ had discarded the object. The red and blue shopping
bags contained blue pills. The pills were small and stamped with
"M" on one side and "30" on the reverse side, which is common
for counterfeit oxycodone pills containing fentanyl. HPD
Detective Tom Heffner determined the Blue bag contained eight
separate gallon sized plastic bags of suspected fentanyl pills
that had an approximate gross weight of approximately 19.11
pounds. The red bag had twenty-eight plastic sandwich size bags
of suspected fentanyl pills with a gross weight of
approximately 6.73 pounds. The pills are currently pending
submission to the DEA Southwest Regional Drug Laboratory for
identification.

45.    CHP Officer Lopez's canine alerted to the odor of
narcotics emanating from the SUBJECT VEHICLE while the vehicle
was located at 4621 Olanda St. HPD officers and DEA Agents

conducted a brief search of the SUBJECT VEHICLE to ensure that no other occupants were inside of the vehicle. HPD then transferred the SUBJECT VEHICLE to the HPD Evidence Bay where it is being held.

## II.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

46.  Based on my training and experience, including my familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices, and in their homes, cars, garages, and storage units.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This

includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones or other digital devices, of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

e.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

f.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, garage, car, and storage units, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

g.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on

their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, and at their homes, cars, garages, and storage units.

27.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

28.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other

individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

      b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

      c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

29.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## III.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[5]

30.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IV.  <u>CONCLUSION</u>

32.  For all the reasons described above, there is probable cause to believe that LOPEZ has committed violations of violations of 21 U.S.C § 841(a)(1) (Possession with Intent to Distribute and Distribution of a Controlled Substance) and 18 U.S.C § 924(c) (Carrying a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, a Drug Trafficking Crime), and that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the Subject Offenses will be found in the SUBJECT VEHICLE and SUBJECT PHONE as described in Attachment A-1 and A-2.

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
14th day of June, 2024.

_Patricia Donahue_
_____
THE HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE